IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

PERRY B. GAINS,

        Plaintiff,

v.                            CIVIL ACTION NO. 1:24-CV-99
                                      (KLEEH)

ANTERO RESOURCES CORPORATION et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT ANTERO'S MOTION TO COMPEL ARBITRATION [ECF NO. 43]

Pending before the Court is *Antero Resources Corporation's Motion to Compel Arbitration and Stay this Action* [ECF No. 43]. For the reasons stated herein, the Motion [ECF No. 43] is **GRANTED.**

### I.    PROCEDURAL BACKGROUND

Plaintiff Perry B. Gains ("Plaintiff" or "Gains") filed a Complaint in the Circuit Court of Doddridge County, West Virginia on September 12, 2024. ECF No. 1.  Defendants Antero Resources Corporation ("Antero"), Elaine S. Hunter, Lawrence L. Marshall, Thomas F. Menzel, Margaret D. Marshall Estate, Marjorie Smith, and Mary Ann Taylor (collectively "Defendants") removed the case to this Court on October 17, 2024.  Id.

Plaintiff alleges five causes of action: Count I: Conversion – Defendant Antero; Count II: Quiet Title/Declaratory Judgment – Defendant Antero and all Necessary/Indispensable Parties; Count III: Unjust Enrichment – Defendant Antero; Count IV: Trespass –

Defendant Antero; and Count V: Waste – Defendant Antero. ECF No. 1-1.

Antero filed the subject Motion to Compel Arbitration and Stay Litigation on June 18, 2025. ECF No. 43.  On the same day, Antero filed a Motion for Leave to Amend Its Answer and Assert a Counterclaim. ECF No. 44.  Antero's basis for filing a Motion to Amend was that it obtained a "Working Agreement" which contained an arbitration clause that allegedly bound the parties. ECF No. 44.  On July 9, 2025, Gains filed Responses in Opposition to the Motion for Leave and to Compel Arbitration. ECF No. 48, 49. On July 16, 2025, Antero filed a Reply to Gains' Response to the Motion for Leave and to Compel Arbitration. ECF No. 53, 54. The motion to compel arbitration is fully briefed and ripe for review.

## II.  FACTUAL BACKROUND

The following facts are from Plaintiff's State Court Complaint. This case arises out of alleged improper and wrongful conduct related to the extraction and sale of oil and hydrocarbons from an Estate.  Specifically, the "common practice in Doddridge County in the early 1900s of . . . splitting the oil and gas estates into separate entities . . . for the purpose of development and operation." Compl., ECF No. 1-1, at ¶ 17.

Plaintiff Gains owns all rights to the Marcellus Shale oil leasehold in Doddridge County, West Virginia, which covers approximately 85 acres. Id. at ¶ 9.  Gains alleges that he recently

2

discovered Defendant Antero "is currently pooling, developing and exploiting the Estate . . . and that the Defendant has been unlawfully selling oil and related hydrocarbons from the Estate." Id. at ¶ 10.  Defendant Antero is a producer of natural gas and oil and operates wells in West Virginia. Id. at ¶ 3.  All other Defendants are the owners of the oil fee estate at issue and have been receiving oil royalties from Mr. Gains for years. Id. at ¶ 3.

Gains is the successor in interest/current owner of the entirety of the oil Estate, but the oil and gas estates were split into two separate estates in the early 1900s. Id. at ¶ 13-14, ex. 4.  Gains alleges that because Antero "had, and has, actual and constructive knowledge" of this common practice, Antero had a duty to investigate Mr. Gains' ownership of the Estate. Id. at ¶ 18. Furthermore, because Gains ownership of the Estate is publicly available, Antero must have had an actual and constructive notice of such ownership. Id. at ¶ 19.  Therefore, Antero allegedly had knowledge that its chain of title was defective and "does not qualify as a bona fide purchaser at value." Id. at ¶ 20-21.

According to the Complaint, Antero has continued operating and producing the Estate with "actual, constructive, and record notice that Mr. Gains owns the Estate." Id. at ¶ 26.

### A. Antero's Motion to Compel Arbitration [ECF No. 43]

The following facts are taken from Defendant Antero's Motion to Compel Arbitration, its Memorandum in Support of the Motion,

and its Motion for Leave to Amend its Answer and Assert a Counterclaim.

The Motion to Compel Arbitration was filed after Antero allegedly discovered, during discovery, a working agreement entered into by the parties' predecessors in interest. ECF No. 44, at 1. Antero asserts that "Antero and Plaintiff are both lessees under a single Subject Lease—Antero is the lessee of the gas and gas leasehold, and Plaintiff is the lessee of the oil and oil leasehold. ECF No. 43-1, at 1.

On October 19, 1908, the J.S. and Jane Netzer leased the oil and gas rights to their property to Hope Gas for a term of 10 years. Id. at 2.  On July 18, 1918, before the expiration of the lease, the Netzers and Hope Gas signed another lease that was effective as a renewal on the day the original lease expired. Id. at 2-3.  On December 5, 1918, while the first lease was still in effect, Hope Gas assigned its oil leasehold and development rights to Carter Oil. Id. at 3.  This created two separate lessees and leasehold estates under the Subject Lease. Id.

Especially relevant to Antero's Motion to Compel Arbitration is that under the Hope-Carter Agreement, Hope Gas and Carter Oil "entered into the Working Agreement, which governed the parties' rights and responsibilities with respect to conducting operations on their respective leasehold estates under the Subject Lease." Id. at 1.  This Working Agreement contains a mandatory arbitration

4

clause. Id. at 5.  In addition, the Hope-Carter agreement expressly states that the Subject Lease is subject to preexisting working agreements. Id. at 3.

On February 26, 2025, Carter Oil assigned its rights in the Subject Lease, the oil rights it received from the Hope-Carter Assignment, to C.H. Pigott. Id. at 4.  The Carter-Pigott assignment provided that "the oil and oil rights in the Subject Lease were conveyed from Hope Gas to Carter Oil by the Hope-Carter Assignment[,]" and the agreement stated "that the said lease and leasehold estates are subject to a working agreement between [Carter and Hope Gas.]" Id. at 4.  In addition, the Working Agreement states in relevant part that the "agreement is intended by the companies to be continuing and will, hereafter, by reference merely, be applied to other leases or gas or gas rights thereunder which the Oil Company may from time-to-time assign to the Gas Company." Id. at 5.  Antero claims that this Working Agreement governs the dispute at issue in this case because Antero and Plaintiffs are successors in interest to Hope Gas and Carter Oil. Id.

## III. LEGAL STANDARD

### A. Federal Arbitration Act (9 U.S.C. §§ 2, 3)

The Federal Arbitration Act ("FAA") outlines the "procedures for enforcing arbitration agreements in federal court." Smith v. Spizzirri, 601 U.S. 472, 473 (2024). Section 2 of the FAA states:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

9 U.S.C.A. § 2. The Fourth Circuit holds, "a litigant can compel arbitration under the FAA if he can demonstrate: '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" Adkins v. Labor Ready. Inc., 303 F.3d 496, 500-501 (4th Cir. 2002). Additionally, section 3 of the FAA sets forth that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue

6

> referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

### B. West Virginia State Contract Law

"Although federal law governs the arbitrability of disputes, ordinary state-law principles resolve issues regarding the formation of contracts." Lawhun v. CMH Homes, Inc., No. 1:22-CV-112, 2023 WL 5280909, at *5 (N.D. W.Va. Aug. 16, 2023) (internal citation omitted); see In re Cotton Yarn Antitrust Litig., 505 F.3d 274 (4th Cir. 2007)("State contract law govern the question of whether the parties have agreed to arbitrate....").

Therefore, questions regarding incorporation by reference of writings are governed by State contract law. The Supreme Court of Appeals of West Virginia holds that a three-pronged test must be satisfied for incorporation by reference to apply:

> In the law of contracts, parties may incorporate by reference separate writings together into one agreement. However, a general reference in one writing to another document is not sufficient to incorporate that other document into a final agreement. To uphold the validity of terms in a document incorporated by reference, (1) the writing must make a clear reference to the other

7

document so that the parties' assent to the reference is unmistakable; (2) the writing must describe the other document in such terms that its identity may be ascertained beyond doubt; and (3) it must be certain that the parties to the agreement had knowledge of and assented to the incorporated document so that the incorporation will not result in surprise or hardship.

Syl. Pt. 2, State ex rel. U-Haul Co. of W. Virginia v. Zakaib, 232 W. Va. 432 (2013).

## IV.  DISCUSSION

Defendant Antero sets forth that the arbitration clause contained in the Working Agreement discussed above governs this dispute and arbitration is therefore mandatory under the FAA. Plaintiff contends that the Working Agreement does not bind the parties before the court and compulsory arbitration, along with a stay, is not mandatory.  In addition, Plaintiff argues that if the parties are subject to the arbitration clause, Antero has waived its right to arbitrate.  For the reasons discussed below, the Court **GRANTS** *Antero Resources Corporation's Motion to Compel Arbitration and Stay this Action* [ECF No. 43]

**A. The Court GRANTS Antero's Motion to Compel Arbitration because the Fourth Circuit's Adkins factors for compulsory arbitration under the Federal Arbitration Act are met.**

Section 2 of the FAA sets forth that

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . or an agreement in writing to submit to arbitration an existing controversy arising

8

> out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

9 U.S.C.A. § 2. The "party seeking to enforce the arbitration agreement, bears the initial burden" of demonstrating to the court that the parties entered into an enforceable arbitration agreement. Little v. Cellco P'ship, 304 F. Supp. 3d 508, 510 (S.D.W. Va. 2018). To satisfy this burden, and compel arbitration under Section 2, a litigant must:

> demonstrate: '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'

Adkins v. Labor Ready. Inc., 303 F.3d 496, 500-501 (4th Cir. 2002).

As a threshold matter, all four of the factors outlined in Adkins are met. Therefore, as discussed further in Section B, if incorporation by reference of the Working Agreement is proper under West Virginia contract law, the Court is inclined to compel arbitration. First, there is clearly a dispute between the parties as evidenced by the filing of the Complaint. See Frashuer v. Altice USA, Inc., No. 2:21-CV-17, 2023 WL 195523, at *3 (N.D. W. Va. Jan.

17, 2023) (holding that the plaintiff's complaint was sufficient evidence of a dispute between the parties).

Second, there is an arbitration provision contained in the Working Agreement which, on its face, binds the parties.  The Working Agreement between Hope Gas and Carter Oil applied to the Subject Lease.  Both the Hope-Carter Assignment and the Carter-Piggott Assignment, which Plaintiff is the successor in interest to, expressly state that the Subject Lease is subject to the Working Agreement.  Therefore, Antero and Plaintiff are successor lessees to the Subject Lease and Working Agreement.  Thus, the parties before the Court are subject to the Working Agreement and bound by the arbitration clause contained therein.[1]  Lastly, the third and fourth Adkins factors are satisfied.  The dispute between Antero and Plaintiff involves interstate commerce because materials produced from the Subject Lease are sold outside of West Virginia.  In addition, factor four is satisfied because Plaintiff has refused to submit the dispute to arbitration. Accordingly, if under West Virginia contract law the Working Agreement was properly

---

[1] Plaintiff further suggests in his Response that Antero's well permitting activity, specifically that "it permitted the well/horizontal legs pursuant to the July 16, 1918, Lease Agreement, . . . not pursuant to prior, unspecified working agreements" means the working agreement was "terminated on its face by operation." However, the document Antero is required to complete during the permitting stages (WW-6A1 Form) does not request disclosure of any contracts associated with the land. Failing to disclose the Working Agreement during the permitting stage is not relevant to the incorporation of the Working Agreement into the 1918 Hope-Carter assignment and subsequent assignments.

10

incorporated by reference, the Motion to Compel Arbitration should be granted.

**B. Under West Virginia contract law, the arbitration agreement applies because the references to the Working Agreement satisfy the U-Haul incorporation by reference standard.**

Where a defendant successfully demonstrates that the parties entered into an agreement to arbitrate, "the burden shifts to the plaintiff to show that even though there was some written contract, [they] did not actually agree to it" for a "reason evincing lack of true agreement." Little, at *10.  Whether a writing, separate from a signed contract between the parties, can be validly incorporated by reference, is a question of State contract law. See Lawhun, at *5; see also Helly v. TriEnergy, Inc., 877 F.Supp.2d 414, 423-24 (N.D.W. Va. 2012) (explaining that the "one important caveat to the reach of the FAA" is that state law governs the formation of the contract).

The Supreme Court of Appeals of West Virginia holds that an exacting three-pronged test must be satisfied for incorporation by reference to apply:

> In the law of contracts, parties may incorporate by reference separate writings together into one agreement.  However, a general reference in one writing to another document is not sufficient to incorporate that other document into a final agreement.  To uphold the validity of terms in a document incorporated by reference, (1) the writing must make a clear reference to the other document so that the parties' assent to the reference is unmistakable; (2) the writing

> must describe the other document in such terms that its identity may be ascertained beyond doubt; and (3) it must be certain that the parties to the agreement had knowledge of and assented to the incorporated document so that the incorporation will not result in surprise or hardship.

Syl. Pt. 2, State ex rel. U-Haul Co. of W. Virginia v. Zakaib, 232 W. Va. 432 (2013).

In U-Haul, the Court dealt with the common law doctrine of incorporation by reference in the context of two documents. Id. at 435.   First, the rental contract that was signed by plaintiffs which contained a provision stating that "the plaintiffs agreed to the terms of the Addendum."  Id.  Second, was the "Rental Contract Addendum" which U-Haul attempted to incorporate by reference into the rental contract. Id.   The addendum contained an arbitration clause. Id.   In holding the addendum was not incorporated by reference, the Court reasoned that the "electronic contracts succinctly referenc[ing]" the Addendum was "not a sufficient reference to the Addendum[.]" Id. at 444.   In addition, the reference was "quite general" and provided "no detail" to ensure those signing the rental agreement were aware of the addendum and its terms. Id.  Furthermore, U-Haul had a practice of supplying the addendum to customers, "only after the Rental Agreement had been executed[,]" and it designed the addendum to "look more like a document folder advertising U-Haul products . . . rather than a legally binding contractual agreement." Id.

Here, Plaintiff contends that Antero cannot satisfy the U-Haul standard for several reasons.  First, "Antero cannot identify . . . the specific 'working agreements' that apply to the Netzer leasehold estates described in the December 5, 1918, Assignment of Leases[,]" and this is evidenced by the omission of descriptive information, "such as the dates of the agreements, recording information and/or instrument numbers."  ECF No. 49, at 10.  In large part, the lack of a date accompanying the description of the Working Agreement in the 1918 Hope-Carter Assignment is the basis for this contention (the 1918 Hope-Carter Assignment states: "subject to the terms of the working agreements dated the ____ day of _____ A.D. 19____").  Id.  In addition, Antero has allegedly failed to show how the Working Agreements apply to the December 5, 1918 Assignment of Leases, what the terms of the working agreements are, and "how this issue is capable of being resolved 'beyond doubt' when the December 5, 1918 Assignment of Leases is general in nature, with no detail/specify being set forth on the face of the instrument, or any indication that arbitration has any relationship to the 1918 Assignment of Leases."  Id.

Despite the absence of precise specificity in the assignments, these arguments are unavailing.  First, although dates or other descriptive information are missing in the December 18, 1918, Hope-Carter Assignment to identify the Working Agreement, the Assignment clearly states:

> [s]aid lands were heretofore embraced in leases for oil and gas purposes in which the The Carter Oil Company owned the leasehold oil rights, and the Hope Natural Gas Company owned the leasehold gas rights under and subject to the terms of the working agreement[.]

ECF No. 43, ex. C, at 3.  The Working Agreement referred to in this excerpt of the Hope-Carter Assignment is clearly the agreement that Hope Gas and Carter Oil entered in anticipation of the 1918 Assignment.  ECF No. 43, ex. E.  Similarly, the subsequent Carter-Pigott assignment on February 26, 1925, states that gas rights are to remain with Hope Gas, "and that the said lease and leasehold estate are subject to a working agreement between The Carter Oil Company and the Hope Natural Gas Company[.]" ECF No. 43, ex. D, at 1.  Therefore, the identity of the Working Agreement referred to by the Hope-Carter Assignment, and then the Carter-Pigott Assignment, is hardly in doubt.  These clear references to the Working Agreement in the assignments make the parties' assent to it unmistakable.

Next, Working Agreement plainly sets forth how it applies to the 1918 Assignment and its terms. ECF No. 43, ex. E.  Lastly, Plaintiff suggests that this case is "highly analogous" to U-Haul because Antero seeks to incorporate "an unspecified 1911 working agreement into a subsequent Assignment of Leases executed in 1918." ECF No. 49, at 9.  However, largely for the same reasons above, this argument falls short. Unlike U-Haul, the parties to each assignment were given more than a succinct reference to the Working

14

Agreement.   Both  assignments  provided  the  necessary  details because they explicitly stated that the singular Working Agreement entered into by Hope Gas and Carter Oil would govern the parties moving forward.  Additionally, there was no effort by any party to conceal  the  Working  Agreement  until  the  assignments  had  been executed.

Accordingly,  the  three-pronged  U-Haul  test  for  incorporation by reference is satisfied.  Under the Working Agreement, there is an agreement to arbitrate that binds the parties before the court. Thus,  unless  Antero  waived  its  right  to  arbitrate,  this  matter should be arbitrated pursuant to Sections 2 and 3 of the Federal Arbitration Act.

## C. Antero has not waived its right to arbitrate because the time between its discovery of the Working Agreement, and it seeking to compel arbitration, is not sufficient to constitute waiver.

"Nothing  in  the  Federal  Arbitration  Act,  9  U.S.C.  §  2, overrides  normal  rules  of  contract  interpretation.   Generally applicable  contract  defenses—such  as . . .  waiver . . .  may  be applied  to  invalidate  an  arbitration  agreement."   Syl.  Pt.  3, Williams v. Tucker, 239 W.Va. 395 (2017).  Furthermore, under West Virginia contract law:

> [t]he common-law doctrine of waiver focuses on
> the  conduct  of  the  party  against  whom  waiver
> is  sought,  and  requires  that  party  to  have
> intentionally  relinquished  a  known  right.  A
> waiver may be express or may be inferred from
> actions  or  conduct,  but  all  of  the  attendant
> facts,  taken  together,  must  amount  to  an

15

> intentional relinquishment of a known right. There is no requirement of prejudice or detrimental reliance by the party asserting waiver.

Id. at Syl. Pt. 5.

The Fourth Circuit holds that "[a] party may waive its right to insist on arbitration if the party 'so substantially utilize[es] the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay." MicroStrategy, Inc. v. Lauricia, 268 F.3d 244, 249 (4th Cir. 2001) (explaining that "the dispositive question is whether the party objecting to arbitration has suffered actual prejudice."). Therefore, the party opposing arbitration based on waiver bears a "heavy burden." Id. at 250 ("Neither delay nor the filing of pleadings . . . without more" is sufficient to constitute waiver.).

This heavy burden is not overcome when, with knowledge of an applicable arbitration agreement, the proponent of such arbitration participates in litigation for over eight months, engages in discovery, participates in mediation, and has a motion decided before the court. Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc., 380 F.3d 200, 203, 205 (4th Cir. 2004) (explaining where discovery produced an agreement to arbitrate entered by the proponent's successor in interest four months before arbitration was sought, that delay did not constitute waiver.). Lastly, because of the "strong federal policy favoring arbitration" the

16

Fourth Circuit "will not lightly infer the circumstances constituting a waiver." Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 95 (4th Cir. 1996).

Here, Mr. Gains contends that Antero, through its active participation in litigation for an extended time, without raising arbitration as an affirmative defense, has waived its right to arbitrate. ECF No. 49, at 11-14.  According to Gains, Antero's participation includes "multiple discovery requests, scheduling/confer conferences, and case development." Id. at 13-14.  However, like Patten, the delay between Antero's discovery of the Working Agreement (February 27, 2025) that bound its successor in interest, and it moving to compel arbitration (June 18, 2025), was around four months.  Likewise, the time between the filing of the Complaint and Antero's Motion to Compel Arbitration was roughly nine months (September 12, 2024, to June 18, 2025). Antero's participation in litigation for this period does not rise to the level of substantial utilization of the litigation machinery. MicroStrategy, 268 F.3d at 249.  Thus, Plaintiff fails to meet the heavy burden of showing Antero waived its right to arbitrate.

Accordingly, this Court declines to accept waiver as an applicable defense and **GRANT** Antero's Motion to Compel Arbitration and Stay this Action [ECF No. 43].

17

**V.    CONCLUSION**

For the reasons discussed above, *Antero Resources Corporation's Motion to Compel Arbitration and Stay this Action* [ECF No. 43] is **GRANTED**. The parties **SHALL** participate in arbitration. This action is thus **DISMISSED** without prejudice pending arbitration and **STRICKEN** from the Court's active docket.[2] Any remaining pending motions are accordingly **DENIED AS MOOT**.

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to counsel of record.

DATED: March 31, 2026

THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA

---

[2] "[D]ismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709-10 (4th Cir. 2001); Simmons v. TA Operating, LLC, 2023 WL 2759771, at *6 (S.D.W. Va. Mar. 31, 2023).